IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

|  |  |  |
|---|---|---|
| SHERWOOD CLEMENT | ) | |
| and | ) | Case No. 4:12-cv-00012 |
| CHANDLER HUGHES, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| RAY SATTERFIELD, | ) | By: Jackson L. Kiser, |
| | ) | Senior United States District Judge |
| Defendant. | ) | |

Before me is Defendant's Motion for Summary Judgment [ECF No. 23], which was filed on January 11, 2013. Plaintiffs filed a timely Response in Opposition to Defendant's Motion [ECF No. 28] on January 25, 2013, and Defendants followed by filing their Reply [ECF No. 29] on February 1, 2013. On February 5, 2012, I heard oral argument from both sides outlining their respective positions on the law, the facts, and the nature and extent of the record. At oral argument, I granted Plaintiffs' request to file additional briefings in this case, which Plaintiffs filed on February 15, 2013 [ECF No. 32]. Defendant responded on February 19, 2013 [ECF No. 33]. Having thoroughly reviewed the briefs, the record, and the arguments of counsel, the matter is now ripe for decision. For the reasons stated below, I **GRANT** Defendant's Motion in part, and **DENY** Defendant's Motion in part.

## STATEMENT OF FACTS[1]

This case arises from the alleged discrimination of Sherwood Clement ("Clement"), and the alleged discrimination of, and subsequent retaliation against Chandler Hughes ("Hughes"),

---

[1] The following facts are presented in the light most favorable to Plaintiffs, the non-moving party. See Anderson v. Liberty Lobby Inc., 477 U.S. 242, 255 (1986).

collectively "Plaintiffs," by Ray Satterfield ("Defendant"). Clement, an African-American male who suffered a stroke several years ago, alleges that he was denied the opportunity to become a vendor at the South Boston farmer's market on account of his race and his disability. Hughes, also an African-American, alleges that he was removed from his position as Vice President of the Halifax County Farmer's Market Association and removed as a vendor because of his race and because he complained about the discriminatory treatment of Clement. Plaintiffs allege that the discriminatory decisions were made by Defendant, the then-and-current President of the Halifax County Farmers Market Association ("the Association").

*1. The Halifax County Farmer's Market Association*

The Association is an unincorporated private organization comprised of vendors in Halifax County, Virginia. During 2010, the Association maintained two marketplaces, one located in South Boston, Virginia and one in Halifax, Virginia. (See Satterfield Dep. 24:8-9; 30:1-32:1, Nov. 15, 2012.) Currently, the Association only operates the South Boston marketplace. (See id.) At all times relevant hereto, the Association was governed by its own Bylaws, which set forth the Association's mission to "engage in retail marketing activities for producers of farm and home products." (Def.'s Br. in Supp. in of Mt. for Summ. J. ("Def.'s Br.") [ECF No. 24.], Ex. 4.) The Association is funded solely by vendor permit fees, and it has never received direct public funding or subsidies. (See Def.'s Br., Ex. 7.)

The Association maintains the South Boston Marketplace on property that it leases from the town of South Boston. (See id.) The property consists of a parking lot and two shelters, which the town built from a grant from the Virginia Tobacco Indemnification and Community Revitalization Commission. (See id.) In 2008, South Boston used funding from the United States Department of Agriculture and local funds to purchase several display tables, compost

bins, other kitchen items, and a refrigeration unit for the marketplace, all of which the town still owns.  (See id.)

In order to become a vendor at the farmer's market, the Association's Bylaws require interested individuals to submit an application and pay a membership fee.  (See Def.'s Br., Ex. 4.)  At all relevant times, the application stated that, "*If you do not raise produce then you cannot be a producer/vendor and sell produce at any Halifax County Farmers' Market Association Markets.*" (emphasis in original).  (See Def.'s Br., Ex. 8.)  Thus, all interested vendors must be "bone fide producer[s] of farm and home products."  (Id.)  During the relevant period, interested vendors could obtain applications from Defendant or Hughes, then-acting President and Vice President, respectively.  (See Satterfield Dep. 51:1-52-4; Hughes Dep. 37:22-39:25, Nov. 15, 2012.)

### 2. *Alleged Discrimination Against Clement*

Taking the evidence in the light most favorable to Plaintiffs, it appears that Clement first called Defendant in early 2010 to inquire about becoming a vendor at the South Boston marketplace.  (See Clement Dep. 25:13-16, Nov. 15, 2012.)  Defendant advised Clement that he would need to raise his own produce to be eligible to join the Association.  (See id. at 30-2-33:25.)  Defendant then instructed Clement to call him once Clement had planted his produce.[2] (See id.)  Following their exchange, Clement proceeded to plant his garden and then attempted to contact Defendant.  (See id.)  According to the Complaint, Clement tried to call Defendant several times but was unable to reach him.  (See Compl. ¶ 12.)  At his deposition, Clement testified that he tried to call Defendant two times a week for several months, which Hughes confirmed at his deposition. (See Hughes Dep. 40:12-21) ("[Clement] had told me he had tried to

---

[2] It appears from the record that the two men never actually spoke. Instead, Defendant left those instructions on Clement's answering machine.

start calling [Defendant] from January right on up until late June . . . and he couldn't get in touch, [Defendant] never returned his call, [Clement] couldn't get in touch but that one time when [Defendant] left it on the answer machine.")  After Clement could not reach Defendant, Clement went to the farmer's market to speak with Defendant in person, but Defendant was not there.[3]  (See Clement Dep. 38:1-39:24; Hughes Dep. 50:1-15.)  Clement even reached out to Tamara Vest, a representative for Destination South Boston, to help resolve the situation; however, Vest told Clement "to go back to [Defendant]."  (Clement Dep. 38:1-39:24.)

In July 2010, Clement mentioned to Hughes, who was the acting Vice President of the Association, that Defendant was refusing to provide Clement with an application to join the Association.  (See Clement Dep. 45:11-25)  As a result, Hughes approached Defendant to discuss Clement's interest in becoming a vendor.  (See Hughes Dep. 46:13-15.)  During their conversation, Defendant acknowledged that he was aware of Clement's interest in becoming a vendor, but he provided a racially derogatory explanation for the situation.  (See id. at 26:2-27:20)  Specifically, Defendant responded that he "didn't want too many [black people or n*ggers] there."[4]  (See id. at 27:6-10)  Hughes opined that, "I don't take it that he was talking about customers . . . he was talking about *[sic]* didn't want too many black vendors" at the farmers market.  (Id. at 31:4-7.)  Furthermore, Hughes testified that the comment was made at the farmer's market and within the context of their conversation about Clement.  (See id. at 28:4-32:8.)

When Clement did not hear from Defendant, Clement submitted several letters to the editors of various local newspapers to draw attention to the situation, which were published on

---

[3] While at the market, a vendor commented to Clement that "certain ones get permits and certain ones don't." (See Clement Dep. 39:4)

[4] At his deposition, Hughes could not remember whether Defendant used "black people" or the "N" word.  For this Motion, however, I will assume that Defendant actually used the alleged racial epithet.

- 4 -

October 27, 2010, November 14, 2010, and December 8, 2010.  (See Def.'s Br., Ex. 12.)  In these letters, Clement claimed that he was denied a permit from the Association because of his physical disability.  (See id.)  According to the Complaint, Clement had a stroke several years ago, which has left him with paralysis to his left arm and leg and has left him with observable speaking difficulties.  (See Compl. ¶ 4.)  Clement's letters raised concerns from other members of the Association.  At the Association's end-of-year meeting for 2010, Defendant was questioned by another member about Clement's letters to the editor.  (See Satterfield Dep. 146:5-14.)  In response to these inquiries, Defendant stated, in an open meeting in front of the entire membership, "[w]ell, [Plaintiff] can't even go to the grocery store by hisself," implying that Clement was too disabled to receive a permit.  (Id.)  Defendant later clarified that he did not issue a permit to Clement because Clement had not filled out an application and because Clement had not planted any produce—two requirements to join the Association.  (See id.)

### 3. *Alleged Discrimination against Hughes*

Sometime after Hughes approached Defendant to talk about Clement's interest in joining the Association, Hughes was removed from his position in the Association.[5]  According to Defendant, Defendant received several complaints from female members of the Association on July 10, 2010, claiming that Hughes was sexually harassing them.  (See Satterfield Dep. 67:8-79:9.)  Defendant, along with William McCaleb, a representative of Virginia Cooperative Extension for Halifax County, interviewed these women regarding the allegations, and the women prepared written summaries.  (See id.)  After speaking with the complainants, Defendant called an impromptu board meeting to discuss the allegations, which was attended by the two remaining voting members of the Board: Brenda Watts, Secretary, and Elizabeth Cole, Treasurer.

---

[5] The parties dispute the temporal proximity between the two events.  From my review of the record, the exact timeline is not clear.  For this motion, however, I will assume that Hughes was removed from the Association shortly after their conversation about Clement.

(See id. at 79:12-24.)  Defendant convened the meeting the same day that he heard the allegations, and Defendant did not give advanced notice of the meeting to anyone, including Hughes.  (See id.)  At the meeting, the three Board members conferred and voted to remove Hughes from the Association due to his inappropriate behavior.  (See id.)  On July 13, 2010, however, Carl Espy, *ex-officio* member of the Association, urged Defendant to hold another meeting so that Defendant could provide proper notice to all parties prior to rendering a decision. (See Pl.'s Resp. in Opp. to Def.'s Mt. for Summ. J., ("Pl.'s Resp.") [ECF No. 24], Ex. 4.)  Linda Wallace, another *ex-officio* board member, also expressed concerns about the meeting.  (See Pl.'s Resp., Ex. 5.)  In an email to Defendant, Ms. Wallace noted that she was worried about "possible collusion" among the complainants, especially because one of the complainants was also a Board member.  (Id.)  On July 19, Defendant informed Hughes of both the allegations and Hughes's termination, at which point Hughes denied the allegations.  (See Satterfield Dep. 154:7-155:12.) Following Hughes's denial, Defendant again spoke with the women, all of whom affirmed their previous statements.  Defendant then called a second Board meeting to discuss Hughes's denial. At the meeting, however, the Board voted to uphold their decision to remove Hughes from the Association.  The second meeting was also held without proper notice.  (See id. 154:7-157:20.)

**PROCEDURAL HISTORY**

Plaintiffs filed this instant action on April 2, 2012, alleging a violation of 42 U.S.C. §§ 1981 and 1983, the Equal Protection Clause of the Fourteenth Amendment, §§ 42 U.S.C. 12132 and 12182 of the Americans with Disabilities Act, 42 U.S.C. §§ 2000a and 2000d, and retaliation under all proceeding grounds.  On January 11, 2013, Defendant moved for summary judgment on all of Plaintiffs' counts.  In Plaintiffs' Response, Plaintiffs withdrew their claims under § 1983, the Equal Protection Clause, §§ 2000a and 2000d.  In Plaintiffs' supplemental briefings,

Plaintiffs also withdrew their cause of action under 42 U.S.C. § 12132 of the ADA. As such, only Plaintiffs' claims pursuant to § 1981, retaliation under § 1981, and § 12182 of the ADA ("Title III") remain.

## STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); George & Co. LLC v. Imagination Entm't Ltd., 575 F.3d 383, 392 (4th Cir. 2009). A genuine dispute of material fact exists "[w]here the record taken as a whole could . . . lead a rational trier of fact to find for the nonmoving party." Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009) (internal quotation marks and citing reference omitted); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). On a motion for summary judgment, the facts are taken in the light most favorable to the non-moving party insofar as there is a genuine dispute about those facts. Scott, 550 U.S. at 380. At this stage, however, a court's role is not to weigh the evidence, but simply to determine whether a genuine dispute exists making it appropriate for the case to proceed to trial. Anderson, 477 U.S. at 249. To withstand a summary judgment motion, the non-movant must produce sufficient evidence from which a reasonable jury could return a verdict in his favor. See Anderson, 477 U.S. at 248. "Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of the non-movant's case." Thompson v. Potomac Electric Power Co., 312 F.3d 645, 649 (4th Cir. 2002).

## DISCUSSION

### I.    Section 1981

"Section 1981 outlaws race discrimination in the making and enforcement of private contracts." Murrell v. Ocean Mecca Motel, Inc., 262 F.3d 253, 256 (4th Cir. 2001). The statute

provides, in pertinent part, that, "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as enjoyed by white citizens." 42 U.S.C. § 1981(a). To that effect, § 1981 extends to the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Murrell, 262 F.3d at 257; see also 42 U.S.C. § 1981(b). To establish a § 1981 claim, a plaintiff must show: (1) that the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerns one or more of the activities enumerated in the statute. See Jordan v. Alt. Resources Corp., 458 F.3d 332, 345 (4th Cir. 2006) (citing Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2nd Cir. 1993) (listing the elements of a § 1981 action)).

In analyzing claims under § 1981, courts employ the familiar Title VII proof standards. See Gairola v. Virginia Dept. of Gen. Serv., 753 F.2d 1281, 1285 (4th Cir. 1985); see also Middlebrooks v. Univ. of Maryland, No. 97-2473, 1999 WL 7860, *4 (4th Cir. Jan. 11, 1999) (per curiam) (unpublished). Accordingly, plaintiffs have two avenues to survive summary judgment. Plaintiffs can provide direct evidence of discrimination, or plaintiffs may proceed using circumstantial evidence under the burden-shifting scheme set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Jane v. Bowman Gray Sch. of Medicine-North Carolina Baptist Hosp., 211 F. Supp. 2d 678, 691 (M.D.N.C. 2002). As the Fourth Circuit recently cautioned, however, "'courts must . . . resist the temptation to become so entwined in the intricacies of the McDonnell Douglas proof scheme that they forget the scheme exists solely to facilitate determination of the 'the ultimate question of discrimination vel non.'" Meritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 295 (4th Cir. 2010) (quoting Proud v. Stone, 945 F.2d 796, 798 (4th Cir. 1991)). Thus, "[n]otwithstanding the intricacies of proof schemes," the

ultimate question in every disparate treatment case is "whether the plaintiff was the victim of intentional discrimination." Meritt, 601 F.3d at 294-95. (internal citations omitted).

### A.  Clement's Claim of Race Discrimination under § 1981

In Count I of the Complaint, Clement claims Defendant violated 42 U.S.C. § 1981 because Defendant intentionally denied Clement the right to contract to become a vendor at the farmer's market on account of his race.  (See Compl. ¶ 27.)  As discussed below, however, Clement's admissions during his deposition have "undone his case."  Lightner v. City of Wilmington, 545 F.3d 260, 264 (4th Cir. 2008).

In the present case, Defendant argues that summary judgment is appropriate under either proof scheme because Clement admitted during his deposition that he was denied the opportunity to become a vendor in the farmer's market solely because of his disability.  In light of those admissions, Defendant argues that Clement has answered the dispositive question of discrimination vel non in the negative.  Specifically, Defendant relies on Lightner v. City of Wilmington, 545 F.3d 260 (4th Cir. 2008).  In Lightner, the plaintiff, a police officer, filed suit under Title VII claiming that he was discriminated against on account of his race and gender. See id. at 263.  During the plaintiff's deposition, however, the plaintiff admitted that the "real reason for his suspension was to cover up department wrongdoing," which is not actionable under Title VII.  Id. at 263-4.  The Court expressly noted that the plaintiff's multiple "admissions during litigation [were] binding."  Id. at 264.  Thus, the Court ultimately held that, "[i]n offering this explanation as to the real reason for the employer's action, the plaintiff has undone his case.  He has tried to make a statute aimed at discrete forms of discrimination and turn it into a general whistleblower statute, which of course Title VII is not."  Id. at 264.

Defendant's argument is well-taken. During his deposition, Clement testified that he did not believe that he was discriminated against on account of his race. (See Clement Dep. 69:1-72:22). Instead, Clement testified that Defendant denied him a permit because of his disability. (See id.) At the deposition, Defendant's counsel presented Clement with a copy of his letters to editors of various local newspapers. Defendant's counsel read the letters aloud to Clement, which stated: "I truly feel I was not discriminated against because I was one of those people, but feel it is because of my disability." (Id. at 72:6-22.) The following exchange occurred:

> Q: Now if you will look at this first page, the third paragraph of
>    your letter, and it starts with: "I truly feel," do you see that?
> A: Uh-huh.
> Q: I truly feel I was no discriminated against because I was one of
>    those people, but feel it is because of my disability?
> A: Yeah.
> Q. Is that how you felt at the time?
> A: Yeah, I feel it now.
> Q: So was that a complete statement of what you felt at the time,
>    that is was based on your disability?
> A: Yeah.
> Q: And you said that is still how you feel?
> A: Yes, sir.

(Id.)[6] While Clement never explained what he meant by "those people," Clement's counsel conceded at oral argument that Clement was referring to race, and he further conceded that Clement did not believe was a victim of racial discrimination. Because § 1981 does not prohibit discrimination on the basis of disability, Plaintiff has undone his own case. See Lightner, 545 F.3d at 264; see also Farrell v. Acme Markets, Inc., No. CCB-08-1992, 2011 WL 778583, *7 (D.

---

[6] While Clement did not know about Defendant's racially charged statement at the time of his letters to the editors, it is clear from the record that Clement was aware of Defendant's statement at the time of his deposition. (See Compl. ¶ 19; see also Def.'s Br., Ex. 10.) In fact, Clement was allowed to sit in on Hughes's deposition prior to giving his own deposition testimony. Even after hearing Hughes's testimony regarding the circumstances in which Defendant made the statement, Clement still testified that he was discriminated against because of his disability.

- 10 -

Md. Feb. 10, 2011); <u>Shivers v. South Carolina Dept. of Corrections</u>, No. 3:09-3367-MBS-JRM, 2011 WL 4549266, *7-10 (D.S.C. Sept. 1, 2011).

While Clement concedes that he "truly believes" he was discriminated against because of his disability, Clement argues that <u>Lightner</u> does not apply in this case. Specifically, Clement argues that <u>Lightner</u> is limited to cases that fall under the <u>McDonnell Douglas</u> framework and does not extend to cases where there is direct evidence of racial discrimination. Even assuming that Clement has shown direct evidence of racial discrimination, Clement's argument ultimately falls flat. Foremost, Clement argument asks me to read <u>Lightner</u> backward. From the Court's opinion, it is clear that the Court discussed the effect of the plaintiff's admissions irrespective of the evidence scheme employed. <u>See</u> <u>Lightner</u>, 545 F.3d at 264. The Court first concluded that plaintiff's admissions were fatal. <u>After</u> the Court concluded that plaintiff had undone his own case, the Court expressly noted that "[t]he application of the <u>McDonnell Douglas</u> framework to plaintiff's case **reinforces** the point that he was not discriminated against on the basis of race or gender." <u>Id.</u> at 264 (emphasis added). In fact, the Court expressly held that the plaintiff's "acknowledgement standing alone would completely refute the plaintiff's claim." <u>Id.</u> at 264 (citing <u>Rothmeier v. Investment Advisers, Inc.</u>, 85 F.3d 1328 (8th Cir. 1996)). Accordingly, I disagree with Clement that <u>Lighter</u>'s admonishments are limited to cases with solely circumstantial evidence.

Accepting Clements's argument would require a disingenuous reading of <u>Lighter</u>. Whether Clement were to proceed to trial with direct or circumstantial evidence, Clement would be asking the jury to disregard his own beliefs about why he was denied a permit. This categorization of the legal system's purpose is simply untenable. As noted by the Fourth Circuit, I must "resist the temptation to become so entwined in the intricacies of the <u>McDonnell Douglas</u>

- 11 -

proof scheme that [I] forget the scheme exists solely to facilitate determination of the 'the ultimate question of discrimination <u>vel non</u>.'" <u>Meritt</u> 601 F.3d at 295 (quoting <u>Proud</u>, 945 F.2d at 798). Here, Clement does not need a jury to answer that ultimate question of discrimination. He has provided his own unequivocal explanation for the situation: he was denied a permit because of his disability. Given Clement's clear admissions that he does not believe he was a victim of race discrimination, Clement has "negate[d] his claims of race . . . discrimination." <u>Lightner</u>, 545 F.3d at 264. Accordingly, I **GRANT** Defendant's Motion for Summary Judgment with respect to Clement's race discrimination claim under § 1981.

### B. Hughes's Race Discrimination Claim under § 1981

In Count I, Hughes alleges that he was removed from his position as Vice President of the Association and removed as a vendor in the Association in violation of § 1981. As detailed below, however, summary judgment is appropriate with respect to Hughes's claim.

#### 1. Direct Evidence

Hughes first argues that he should survive summary judgment because he has provided direct evidence of racial discrimination. Specifically, Hughes argues that Defendant's racially derogatory statement about Clement constitutes direct evidence of Defendant's racial animus toward Hughes. Direct evidence, however, is "evidence which, if believed, would prove the existence of a fact in issue without inference or presumption." <u>O'Connor v. Consolidated Coin Caterers Corp.</u>, 56 F.3d 542 (4th Cir. 1995), <u>rev'd on other grounds</u> by <u>O'Connor v. Consolidated Coin Caterers Corp.</u>, 517 U.S. 308 (1996). For our purposes, direct evidence comprises "statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested . . . decision." <u>Warch v. Ohio Cas. Ins. Co.</u>, 435 F.3d 510, 520 (4th Cir. 2006). "In order for derogatory remarks to be indicative of discrimination, the statements must

- 12 -

not be isolated or ambiguous, and there must be a nexus between the statements and the challenged . . . decision." Diamond v. Bea Maurer, Inc., 128 Fed. Appx. 968, 972 (4th Cir. 2005) (unpublished).

Here, Defendant's racially charged statement fails to maintain a sufficient nexus with the Board's decision to remove Hughes from the Association. Even construing the evidence in the light most favorable to Hughes, these statements are, at best, circumstantial evidence of Defendant's general racial animus. These statements, standing alone, fail to show that Defendant considered *Hughes's race* when he voted to remove Hughes from the Association. Foremost, Hughes has conceded that Defendant's statements were made with respect to Clement, not Hughes; Defendant's statement did not discuss Hughes, nor did it reference Hughes in any way. Moreover, Defendant made the statement in a completely different context: Defendant made the comment in reference to allowing more black vendors to apply to join the Association, not in the context of removing black directors from the Board. As such, this statement does not "bear directly on the contested . . . decision" to remove Hughes from the Board. Warch, 435 F.3d at 520 (emphasis added); see also Jones v. Overnite Transportation Co., 212 Fed. Appx. 268, 272-73 (5th Cir. 2006) (unpublished).

### 2. Burden-Shifting Framework

Under the McDonnell Douglas burden-shifting framework, the plaintiff must first establish a *prima facie* case of discrimination by a preponderance of the evidence. See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). If a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action. See McDonnell Douglas Corp., 411 U.S. at 802-03. Once the defendant comes forward with such a reason, "the burden reverts to the plaintiff to establish that

- 13 -

the [defendant's] non-discriminatory rationale is a pretext for intention discrimination." <u>Heiko v. Colombo Sav. Bank, F.S.B.</u>, 434 F.3d 249, 258 (4th Cir. 2006). This "final pretext inquiry merges with the ultimate burden of persuading the court that the plaintiff has been the victim of intentional discrimination, which at all times remains with the plaintiff." <u>Merritt</u>, 601 F.3d at 294 (internal quotation marks omitted).

Hughes argues that summary judgment is inappropriate because the Board's purported decision to terminate him because of the sexual harassment allegations is actually a pretext for race discrimination. Even assuming that Hughes has met his burden to set forth a *prima facie* case, Hughes's case ultimately unravels at the pretext stage. As noted by the United States Supreme Court, the "plaintiff bears the burden of proving by a preponderance of the evidence that the [defendant's] proffered reason for the termination is a mere pretext for unlawful discrimination." <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 143 (2000). A plaintiff "can prove pretext by showing that the [defendant's] explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [racial discrimination]." <u>Price v. Thompson</u>, 380 F.3d 209, 212 (4th Cir. 2004). Importantly, however:

> The court's focus is not on the [d]efendant's business judgment or the fairness of its action, but on its motivation. Thus . . . it is not the Court's province to decide whether the reason was wise, fair, or even correct, so long as it truly was the reason for the [defendant's] actions. Accordingly, it is not enough to a plaintiff to show that the [action] was based on groundless complaints, or that the employee did not, in fact, violate the [defendant's] rules prior to the adverse action. Denial that misconduct occurs, or claim that the reported events did not, in fact, occur is not material to finding prextext.

<u>Dawson v. United States</u>, 549 F. Supp. 2d 736, 754 (D.S.C. 2008) (quoting <u>Davis v. Seven Seventeen HB Philadelphia Corp., No. 2</u>, No. 1:02-cv-332, 2003 WL 21488523, *7 (M.D.N.C. June 20, 2003) (internal citations omitted)).

Here, Hughes is unable to carry his burden.  Foremost, it is undisputed that the Board received sexual harassment allegations against Hughes from five different female vendors.  There is nothing to suggest that the Board did not actually base its decision on these allegations.  Rather, the inherent credibility of the allegations bolsters the conclusion that the Board, in fact, relied on the sexual harassment complaints in voting to terminate Hughes.  The specificity with which the women described the allegations and their willingness to reduce those allegations to writing speak volumes about the veracity of the allegations, a fact certainly not overlooked by the Board.  Even if Hughes could show that the allegations were false, Hughes cannot show that the Board did not believe the allegations or that the Board was really motivated by Hughes's race.[7]  See Love-Lane v. Martin, 355 F.3d 766, 788 (4th Cir. 2004) ("Simply because [Plainitff] presents evidence that the defendant's justification for their adverse employment decision may be false does not mean that [Plaintiff's] evidence demonstrates pretext for race discrimination."); see also Holland v. Washington Homes, Inc., 487 F.3d 208, 215 (4th Cir. 2007) (discussing the plaintiff's burden of proof to show that the employer's proffered rationale was false).

Instead of attacking the validity of the complaints directly, Hughes argues that the Board's failure to conform to the bylaws and Defendant's general racial animus cast doubt on the entire process.  First, Hughes argues that the Board's failure to provide Hughes notice of the meeting evidences pretext.  Specifically, Hughes argues that he was never afforded the opportunity to defend against the allegations.  Admittedly, the removal process did not comport with the Association's bylaws, but this does not seriously undermine the legitimacy of the Board's ultimate decision.  The record shows that the Board convened a formal meeting specifically to address the allegations against Hughes, during which the Board reviewed the

---

[7] In fact, Hughes admitted during his deposition that he hugged various female members and that he touched one of the complainants on the lower part of her body, top side of her waist, or top part of her butt while her body was touching his face.  (See Hughes Dep. 100:01-104:25)

- 15 -

allegations from all of the complainants. The Board even met a second time after Hughes denied the allegations, and the Board unanimously reaffirmed their decision. While Hughes did not attend either meeting, there is nothing to suggest that the Board's decisions would have been any different if Hughes had been given the opportunity to address formally the allegations. Rather, it is clear that the Board convened the second meeting to address explicitly Hughes's denial. As such, Hughes has not articulated how the Board's failure to provide him notice evidences that the Board was actually motivated by Hughes's race.

Second, Hughes argues that Defendant's prior racial statements show Defendant's racial animus toward Hughes. While Defendant's statements are certainly relevant, the statements were made in a different context and fail to cast doubt on the entire process. Even assuming that Defendant acted with racial animus,[8] Defendant's private motivations were insulated by two other Board members who reviewed the allegations and voted to remove Hughes. There is no evidence that Defendant solicited or procured the allegations, that the Board had reason to doubt the complaints, or that the other Board members were complicit in Defendant's 'orchestrated' removal of Hughes. As such, Hughes has failed to show that Defendant's articulated reason for terminating Hughes was actually a pretext for discrimination.[9] Accordingly, I will **GRANT** Defendant's Motion with respect to Hughes's § 1981 claim.

### C. Hughes Retaliation Claim under § 1981

---

[8] Defendant's purported racial animus toward Hughes is further belied by the fact that Defendant supplied and approved Hughes's membership application in the Association and later supported Hughes's election to Vice President. (See Hughes Dep. at 16:1-22:25, 31:1-32:22, 56:3-57:5.) As stated by the Fourth Circuit in Proud, "[w]hen the hirer and firer are the same individual, there is a powerful inference relating to the 'ultimate question' that discrimination did not motivate the employer, and the early resolution of this question need not be derailed by strict fealty to proof schemes." 945 F.3d at 798.

[9] Even assuming that the evidence could be viewed as Hughes argues, there is no evidence to suggest that the Board would have handled similar allegations against white members differently. See, e.g., Hoyle v. Freightliner, LLC, 650 F.3d 321, 336 (4th Cir. 2011).

Hughes also alleges that Defendant retaliated against him in violation of § 1981 because Hughes "st[ood] up" for Clement. (Compl. ¶ 22.) Specifically, Hughes argues that summary judgment is inappropriate because he "engaged in protected activity by questioning the actions of [Defendant] with regard to Clement. [Defendant] retaliated against Hughes for his protected activity by trumping up charges of sexual harassment against Hughes and removing him from his position as Vice President." (Pl.'s Br. pg. 10.)

Because Hughes has not shown any direct evidence of retaliation, Hughes must proceed under the burden shifting framework and must first establish a *prima facie* case of retaliation. To establish a *prima facie* case of retaliation, Hughes must show that: (1) he participated in a protected activity; (2) he suffered adverse action; and (3) there is a causal link between the protected activity and the adverse action. See Peters v. Jenny, 327 F.3d 307 (4th Cir. 2003).

Here, Hughes cannot make it over the first hurdle. Specifically, Hughes has not adduced any evidence that he participated in a protected activity. Instead, Hughes summarily concludes that he was removed from the Association because he "stood up" for Clement. Even assuming that "standing up" for Clement would constitute a protected activity under § 1981, there is no evidence to establish that he did, in fact, "stand up" for Clement. Viewing the evidence in the light most favorable to Hughes, the record shows, at best, that Hughes approached Defendant to discuss Clement's desire to join the Association. During that conversation, however, Hughes did not question Defendant's response, or attempt to persuade him to allow Clement to join the Association. In fact, Hughes described his reaction to Defendant's racial statements as follows: "I didn't think it was any problem at all, and when he said [the statement], I didn't pay a lot of attention to it because I didn't think nothing [sic] was to it. **That is why I didn't say anything to it**, I thought everything was fine, I got along with [Defendant] and liked him . . . ." (Hughes

- 17 -

Dep. 31:1-32:25) (emphasis added).  Thus, there is no evidence to suggest that Defendant actually "stood up" for Clement.

Hughes's claim that Defendant retaliated against him amounts to a "bald assertion, which lacks both citation to and support in the record."  Baker v. American Airlines, Inc., 430 F.3d 750 (5th Cir. 2005).  As such, I **GRANT** Defendant's Motion with respect to Hughes's claim of retaliation under § 1981.

## II.  <u>Americans with Disabilities Act</u>

In Count V, Clement alleges a violation of 42 U.S.C. § 12182 ("Title III") of the Americans with Disabilities Act ("ADA").  (<u>See</u> Compl. ¶ 51.)  Specifically, Clement alleges that Defendant violated Title III by denying Clement the right to be a vendor at market on account of his disability.  (<u>See id.</u> ¶ 52.)  As discussed below, Clement's claim under Title III survives summary judgment.

### A.  Legal Standard

As noted by the United States Supreme Court, the ADA was enacted to "remedy widespread discrimination against disabled individuals."  <u>PGA Tour, Inc. v. Martin</u>, 532 U.S. 661, 674 (2001).  Specifically, Congress reasoned that, "'historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem.'"  <u>Id.</u> at 675 (quoting 42 U.S.C. § 12101(a)(2)).  As a result, Congress enacted the ADA, which provided a "broad mandate" against disability discrimination in a variety of settings.  <u>Id.</u>

In Title III, Congress proscribed discrimination with respect to places of public accommodation.  Specifically, Title III provides, in pertinent part, that, "[n]o individual shall be

- 18 -

discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 29 U.S.C. § 12181. To properly state a cause of action under Title III, a plaintiff must show: (1) that he is disabled within the meaning of the ADA; (2) that the defendant is a private entity that owns, leases, or operates a place of public accommodation; (3) that the defendant took adverse action against the plaintiff that was based upon the plaintiff's disability; and (4) that the defendant failed to make reasonable modifications that would accommodate the plaintiff's disability without fundamentally altering the nature of the public accommodation. Halpern v. Wake Forest Univ. Health Sci., Civil No. 1:09-CV-00474, 2010 WL 3057597, *21 (M.D.N.C. July 30, 2010) (citing Amir v. St. Louis Univ., 184 F.3d 1017, 1027 (8th Cir. 1999)).

### B. The Farmer's Market is a "Place of Public Accommodation"

The threshold determination in every Title III cases is whether the establishment at issue is a place of "public accommodation." The ADA defines "public accommodation" in twelve discreet categories, which should be "construed liberally to afford people with disabilities equal access to a wide variety of establishments available to the nondisabled." PGA Tour, Inc., 532 U.S. at 676 (internal quotations omitted). Title III enumerates places of "public accommodation" to include "a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment" so long as these establishments affect commerce. 42 U.S.C. § 12181(7)(E). While a farmer's market is not listed expressly in Title III, I find that a liberal construction of subsection (7)(E) encapsulates a farmer's market.[10]

---

[10] While Clement was not directly precluded from entering the Market, he was allegedly denied "full and equal enjoyment" of the market. Specifically, Title III prohibits the "denial of an opportunity . . . to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity." 42 U.S.C. § 12182(b)(A)(i). Thus, Title III protects more than just mere physical entry into a place of public

- 19 -

Defendant contends, however, that the farmer's market is not a place of public accommodation because the farmer's market does not "affect commerce" as required under Title III. (See Def.'s Supp. Br. pg. 8-9.) Specifically, Defendant argues that, "[t]he Assocation engages in the sale of locally grown produce only, and as such its operation does not affect commerce." (Id. at 9.) While Defendant's argument deserves little attention, I address their argument below.

Title III's proscriptions extend to only those places of public accommodation that affect commerce. See 42 U.S.C. §§ 12181(7)(E) and 12181(1). The ADA defines "commerce" to include "travel, trade, traffic, commerce, transportation, or communication . . . among the several States." 42 U.S.C. § 12181(1)(a). Courts have consistently interpreted Title III's definition of commerce as applying the full scope of government's power under the Commerce Clause of the United States Constitution. See, e.g., Pinnock v. International House of Panckaes Franchisee, 844 F. Supp. 574, 579 (holding that Title III "by its own terms reaches as broadly as the Commerce Clause permits"); see also 42 U.S.C. § 12101(b)(4); 28 C.F.R. § 36.103. Under relevant Commerce Clause jurisprudence, it is clear that the Commerce Clause reaches the market's sale of locally grown produce. See Gonzales v. Raich, 545 U.S. 1, 17 (2005) ("Our case law firmly establishes Congress' power to regulate purely local activities that are part of an economic class of activities that have a substantial effect on interstate commerce."); National Federal of Indep. Business v. Sebelius, 132 S.Ct. 2566, 2588 (2012) (quoting United States v. Lopez, 514 U.S. 659, 552-559 (1995) ("'The power of Congress over interstate commerce is not confined to the regulation of commerce among the states' but extends to activities that 'have a substantial effect on interstate commerce.'")).

accommodation. See, e.g., Menkowitz v. Pottstown Memorial Medical Center, 154 F.3d 113, 121-23 (3d Cir. 1998).

- 20 -

Most notably, the Supreme Court's decision in <u>Wickard v. Filburn</u> goes a long way in resolving the question presented here today. <u>Wickard</u>, 317 U.S. 111, 114 (1942). In <u>Wickard</u>, the Court expressly rejected a farmer's argument that growing wheat for home consumption was beyond the reach of the government's commerce power. <u>See</u> <u>National Federal of Indep. Business v. Sebelius</u>, 132 S.Ct. 2566, 2588 (2012) (discussing <u>Wickard</u>). Specifically, the Court reasoned that the farmer's decision to grow wheat, when considered in the aggregate, would have a substantial effect on interstate commerce. <u>See</u> <u>Sebelius</u>, 132 S.Ct. at 2588. Accordingly, Congress had the power under the Commerce Clause to regulate the farmer's local production of wheat. <u>See</u> <u>id.</u> In the present case, the farmer's market goes one step further than the farmer in <u>Wickard</u>. Here, the farmer's market actually <u>sells</u> the locally grown produce, thus engaging in the quintessential economic activity. As a result, it is clear that the market's sale of local produce is "part of an economic class of activities that [in the aggregate] have a substantial effect on interstate commerce." <u>Gonzales</u>, 545 U.S. at 17. Accordingly, it is easy to conclude that the farmer's market is a place of public accommodation that <u>affects commerce</u>.

### C. Satterfield is a Proper Defendant under Title III

Next, I must determine whether Defendant is a proper defendant amenable to suit under Title III. To support summary judgment, Defendant argues that Satterfield is <u>not</u> a proper Defendant because individuals are not subject to suit under Title III. In the alternative, Defendant argues that he did not "operate" the farmer's market. Defendant's arguments are addressed in turn.

### 1. Individuals Are Amenable to Suit under Title III

Defendant's argument that individuals are not proper defendants under Title III is unavailing.[11]  Under Title III, liability may be imposed on "any <u>person</u> who owns, leases (or leases to), or operates a place of public accommodation."   42 U.S.C. § 12182(a) (emphasis added).  While the Fourth Circuit has not answered the question of whether individuals are subject to suit under Title III, "'[n]early every court that has decided the issue of individual liability under Title III has found that individuals can be held responsible for violations of these prohibitions against discrimination if they own, lease, or operate a place of public accommodation."  <u>Guckenberger v. Boston Univ.</u>, 957 F. Supp. 306, 322 (D.Mass. 1997) (internal citations and quotations omitted); <u>see also</u> <u>Coddington v. Adelphi Univ.</u>, 45 F. Supp. 2d 211, 215 (E.D.N.Y. 1999) ("[T]he question of whether a person is a proper defendant under the [Title III] turns not on whether the defendant is a person, partnership, corporation or other entity but, instead, whether the defendant owns, leases or operates a place of public accommodation within the meaning of the ADA."); <u>Howe v. Hull</u>, 873 F. Supp. 72, 77 (N.D. Ohio 1994) ("An individual may be subject to personal liability under [Title III] . . . [t]o hold differently would allow individuals with both the authority and the discretion to make decisions based on a discriminatory animus to violate the ADA with a degree of impunity not envisioned by Congress.")[12]  Without a contrary decision from the Fourth Circuit, I agree with the majority of courts that individuals can be proper defendants under Title III.

---

[11] Defendant also argues at length about whether Defendant is being sued in his individual capacity or in his official capacity as President of the Association.  Resolution of this question is not especially pertinent to resolving whether Defendant is a <u>proper defendant</u> under Title III.  <u>See</u> <u>Coddington v. Adelphi Univ.</u>, 45 F. Supp. 2d 211, 215 (E.D.N.Y. 1999).

[12] While Defendant argues that <u>Baird ex rel. Baird v. Rose</u>, 192 F.3d 462, 471 (4th Cir. 1999), should guide my resolution of this issue, the Fourth Circuit's decision in <u>Baird</u> is inapposite to this present case.  Primarily, the Court's decision did not address individual liability under Title III.  Instead, the Court grappled with whether individual defendants were subject to suit under Title II and/or the retaliation provision of the ADA—neither of which are sufficiently similar to Title III.  First, Title II only covers discrimination by public entities. <u>Compare</u> 42 U.S.C. § 12132 ("[N]o qualified individual . . . , shall be subjected to discrimination **by any such entity**") (emphasis added), <u>with</u>  42 U.S.C. § 12181 ("No individual shall be discriminated against . . .  **by any**

- 22 -

### 2. There Is A Genuine Issue Whether Defendant "Operated" the Farmer's Market

#### a. *Legal Principles*

The contentious issue in this case is whether Defendant "operated" the farmer's market as envisioned by Title III.[13]  Under Title III, the term "operate" means "to put or keep in operation," "to control or direct the functioning of," or "to conduct the affairs of; manage."  Green v. DGG Properties, Inc., Civil No. 3:11-CV-01989, 2013 WL 395484, *13 (D.Conn. Jan. 31, 2013). Specifically, courts have focused on the issue of control in determining whether an individual defendant "operated" a place of public accommodation. See Coddington, 45 F. Supp at 216 Accordingly, the phrase "to operate" has been interpreted "as being in a position of authority and having the power and discretion to perform potentially discriminatory acts[,]" where the discriminatory acts are "the result of exercise of the individual's own discretion, and not merely the implementation of institutional policies or the mandates of superiors." Coddington, 45 F. Supp at 216 (citing Howe, 873 F. Supp. at 77).  In other words, the term "operate" "implies the performance of some sort of function, in conjunction with a degree of sanctioned authority." Howe, 873 F. Supp. at 77.[14]  As a result, an individual may be liable as an operator of a public accommodation where: (1) he or she is in a position of authority; (2) within the ambit of this

person who owns, leases (or leases to), or operates a place of public accommodation") (emphasis added).  As such, the Court's holding with respect to Title III is not particularly informative in addressing individual liability under Title III.  Second, the Court grappled with whether the plaintiff could sue an individual defendant under the anti-retaliation provision of the ADA.  See Baird, 192 F.3d at 471 (discussing 42 U.S.C. § 12203(a)).  While the anti-retaliation provision employs similar language as Title III, see 42 U.S.C. § 12203(a), the anti-retaliation provision limits a plaintiff's remedies to those set forth in 42 U.S.C. § 2000e-5, which does not provide for individual liability.  See Baird, 192 F.3d at 471 (discussing the effect of 42 U.S.C. § 2000e-5 on the anti-retaliation provision).  In contrast, Title III's enforcement provisions incorporate 42 U.S.C. § 2000a-3(a), which expressly provides for injunctive relief against "persons" who violate the applicable substantive law.  See 42 U.S.C. § 12181(a)(1) (citing to 42 U.S.C. § 2000a-3(a)); see, e.g., Black v. Bonds, 308 F. Supp. 774, 776 (D.C. Ala. 1969) (granting injunction against individual defendants under § 2000(a)).  As such, Defendant's citation to Baird is not persuasive.

[13] It is clear that Defendant does not own or lease the farmer's market.

[14] Admittedly, individual defendants are often not proper defendants in Title III actions, as they often lack the requisite control over the institution.  This, however, is not always the case.  See, e.g., Bowen v. Rubin, 385 F. Supp. 2d 168, 180 (2005); Guckenberger, 957 F. Supp. at 322.

- 23 -

authority he or she has both the power and discretion to perform potentially discriminatory acts; and (3) the discriminatory acts are the result of the exercise of the individual's own discretion, as opposed to the implementation of institutional policy or the mandates of superiors. Howe, 873 F. Supp. at 77.

The Court's discussion in Howe is instructive. 873 F. Supp. at 74-78. There, the plaintiff brought suit under Title III, alleging that he was denied medical treatment because he was infected with HIV. See id. Specifically, the plaintiff presented at the emergency room with symptoms of a severe drug reaction. See id. When the emergency room doctor called the on-call admitting physician to obtain permission to admit the plaintiff, the on-call admitting physician refused to admit the plaintiff because of the plaintiff's HIV diagnosis. See id. Plaintiff subsequently sued the hospital and the on-call admitting physician. See id. The Court ultimately held that the on-call admitting physician was a proper defendant under Title III. See id. First, the Court first concluded that the hospital had delegated to him the authority to admit or not admit patients to the hospital. See id. As a result, the Court held that the doctor was in a position of authority and that he had the discretion to determine whether a patient could be admitted from the emergency room to the hospital. See id. Finally, the Court concluded that the doctor was not implementing any hospital policy because the hospital did not have a policy against admitting patients infected with HIV. See id. Accordingly, the Court found that the doctor was amenable to suit under Title III. See id.

### b. Application to the Present Case

Here, there is a genuine issue whether Defendant's actions constitute discrimination under Title III. Viewing the evidence in the light most favorable to Plaintiff, the non-moving party, it appears that the Association delegated to Defendant the authority to administer the

vendor application process. Foremost, the evidence shows that Defendant was the primary contact for obtaining applications; Defendant held the applications and he distributed them to prospective vendors. In fact, the Farmer's Market distributed brochures to the community with only Defendant's contact information. (See Hughes Dep. 39:4-9.) Clement's repeated attempts to contact Defendant to obtain an application reinforce this conclusion. Clement was initially directed to contact Defendant to obtain an application. Even when Clement attempted to get assistance from town representatives outside of the farmer's market, Clement was continuously referred back to Defendant to obtain an application. As such, it appears that Defendant was in a position of authority with respect to the application process.

While Hughes testified that he, too, had access to applications, this does not necessarily lead to the conclusion that Defendant did not exert the requisite control over the market's application process. First, it is not clear whether Hughes had any actual authority over the application process. For example, Hughes testified that Defendant handled about ninety percent of the applications, and Hughes testified that no one really knew that Hughes even had applications. (See Hughes Dep. 39:10-25.) Hughes also testified that he would only hand out applications when Defendant was not present at the market.[15] (See Hughes Dep. 37:22-39:25.) Even assuming the Hughes had some actual authority over the application process, this would not necessarily lead to the conclusion that Defendant did not "operate" the market's application process. For example, the Court in Howe, discussed supra § III.C.2(a), held that the on-call admitting physician was amenable to suit despite the fact that "[the emergency room doctor] could have attempted to contact other physicians with staff privileges at [the hospital] in order to

---

[15] Hughes's actions with respect to Clement further question whether Hughes had any control over the application process. Instead of simply providing Clement with an application, Hughes approached Defendant to discuss Clement's interest. When Defendant explained why he had been avoiding Clement's calls, Hughes did not question Defendant's decisions or try in any way to circumvent Defendant's desire to prevent Clement from obtaining an application.

get [the plaintiff] admitted." 873 F. Supp. at 77. From <u>Howe</u>, the relevant inquiry is whether Defendant possessed discretionary authority, not whether Defendant was the only person with discretionary authority. In other words, the crucial determination is whether Defendant's discretion to provide or withhold applications was circumscribed in some way, either by a policy or by a person in a position of authority over Defendant; it is immaterial whether coordinate members of the Association maintained similar levels of discretion. Here, Defendant has pointed to no evidence to suggest that Defendant's authority to either provide or withhold applications was limited in any way. In total, the evidence—construed in the light most favorable to Clement—creates a genuine issue whether Defendant had discretionary authority over the application process.

Second, there is a genuine issue whether Defendant's position afforded him the "power and discretion to perform potentially discriminatory acts." <u>Howe</u>, 873 F. Supp. at 77. Most notably, there is little evidence to suggest that Defendant's conduct was subject to any meaningful review. Specifically, it appears that neither the Board, nor anyone else oversaw Defendant's decisions regarding the application process. There is no evidence to show that the Board was kept apprised of either interested applicants or Defendant's application decisions. In fact, the evidence shows that Defendant was questioned about his decision <u>only</u> after Clement created negative publicity in his letters to the editors of various local newspapers. Without adequate oversight, Defendant position appears to have afforded him with the inherent power to perform potentially discriminatory acts.[16] In addition to the Association's potential blind eye to Defendant's conduct, Plaintiff's allegations demonstrate that Plaintiff had no viable recourse to challenge Defendant's alleged discriminatory treatment. As such, the evidence presented thus far

---

[16] In fact, construing Plaintiff's allegations as true and accepting that Defendant did, in fact, perform discriminatory acts leads to the inevitable conclusion that Defendant's provided him the "power and discretion to perform discriminatory acts." <u>Howe</u>, 873 F. Supp. at 77.

- 26 -

creates a genuine issue as to whether Defendant had the power and discretion to perform potentially discriminatory acts.

Third, it does not appear that Defendant was acting pursuant to any particular by-law or policy. Admittedly, the by-laws did speak to the application process generally: the Association required interested individuals to raise his or her own produce, complete the application, and pay the vendor permit fee. The by-laws, however, did not delineate any procedure for distributing applications; this task was apparently left to Defendant's discretion. In fact, Hughes testified that the application "process" was somewhat murky:

> Q. Do you know any reason why that would be significant, that [Clement] would need to plant a garden before he called Mr. Satterfield back?
>
> A. I don't know why myself, I have never known anybody else to do that. Mostly, all the cases I have known, when somebody wanted a permit, [they] c[a]me there and pa[id] for the permit, they got it, if they sold something or didn't sell something. And it has happened in some cases that some people have bought permits and didn't sell for the season.
>
> Q. Do you know if those people had produce planted and then chose not to come and sell it?
>
> A. I think some of them might have had intention of planting it when they bought it earlier, because a lot of the people bought permits early during the year, like February or March that hadn't planted anything, [they] just wanted to buy a permit to have a permit, and then they would plant when the season g[ot] [sic] there.

(Hughes Dep. 36:12-37:8.) Moreover, Clement testified that a vendor commented to him that "certain ones get permits and certain ones don't." (See Clement Dep. 39:1-25.) Thus, the evidence creates a genuine issue whether Defendant was acting within his delegated discretion or

whether Defendant was merely implementing a policy when he decided to deny Clement the opportunity to apply.[17]

In response, Defendant cites to <u>Coddington</u> to support summary judgment. 45 F. Supp. 2d 211. Ultimately, however, <u>Coddington</u> is distinguishable from the present case. In <u>Coddington</u>, the Court held that individual employees of a university were not proper defendants in an action under Title III.[18] Specifically, a former nursing student sued a private university and its employees for discriminatory educational practices. <u>See id.</u> at 212. The Court held, however, that the university's employees, who were merely charged with implementing the school's educational policies, were not proper defendants. <u>See id.</u> at 216-18. Because the plaintiff's case challenged the underlying policy, the Court concluded that any relief granted would be against the college, not the employees. <u>See id.</u> As such, there was no reason to allow the case to proceed against the individual employees. <u>See id.</u> at 217 ("It is difficult to believe that Congress intended to impose personal liability upon every person that has made a decision regarding plaintiff's education."); <u>But see</u> <u>Guckenberger</u>, 957 F. Supp. at 323 (holding that a college president "operated" the institution where the president helped to develop discriminatory policies). As discussed above, however, Defendant was not merely implementing the Association's policy. Instead, it appears that the Association delegated to Defendant the unfettered responsibility to administer the application process. Because the Association was

---

[17]  In response, Defendant argues that Defendant was merely implementing the Association's application policy. Specifically, Defendant argues that "[i]t is undisputed that Clement never submitted an Application and that he never tendered the fee. Accordingly, Satterfield's actions were merely implementing the policy of the Association." (Def.'s Supp. Br. at 7.) Of course, however, Defendant's argument ignores that Defendant's alleged discriminatory actions were the very reason Clement failed to comply with the Association's application requirements. Accordingly, Defendant's argument is unpersuasive.

[18]  Defendant also cites to <u>Delvin v. Hammontree</u>, 561 F. Supp. 2d 118 (D.Me. 2008). However, this citation deserves little attention. In <u>Delvin</u>, the court did not reach the issue of whether a grocery store manager "operated" the grocery store. <u>Id.</u> Specifically, the <i>pro se</i> plaintiff in <u>Delvin</u> conceded, without argument, that the store manager did not "operate" the store. <u>Id.</u> Thus, <u>Delvin</u> fails to even address Defendant's argument.

- 28 -

silent as to the proper procedures, Defendant's actions are better viewed as isolated discretionary decisions, as opposed to an implementation of the Association's policy.

While this is certainly a close case, the summary judgment stage is not the proper place for me to weigh the evidence or make creditability determinations; this is why we have trials. Here, there is sufficient evidence in the record to create a genuine issue of material fact as to whether Defendant "operated" the market. As such, Plaintiff survives summary judgment and is entitled to a trial on his Title III claim.

### 3. Clement is Limited To Seeking Injunctive Relief Remedy and Clement Has No Right to a Jury Trial

In Plaintiff's response, Plaintiff concedes that Title III only provides for injunctive relief, and does not authorize monetary damages. (See Pl.'s Supp. Br. at 2). The parties, however, do not address whether Plaintiff is entitled to a jury trial on his Title III claim. The case law makes clear, however, that Plaintiff is not entitled to a jury trial on his Title III claim. See English v. Que Linda, Inc., No. 3:10-cv-237, 2010 WL 4220242, at *2 (E.D. Tenn., Oct. 20, 2010); Harty v. Tathata, Inc., Civil No. 5:10-cv-00113, 2010 WL 3186883, at *1 (E.D.N.C. Aug. 11, 2010); Sharer v. Oregon, No. 04-cv-1690-BR, 2007 WL 3348265, at *3 (D.Or. Nov. 6, 2007); Hobleman v. Kentucky Fried Chicken, 260 F. Supp. 2d 801, 805 (D.Neb. 2003) (citing Dorsey v. City of Detriot, 157 F. Supp. 2d 729, 733 (E.D. Mich. 2001)); Abbott v. Bragdon, 882 F. Supp. 181, 182 (D.Me. 1995). As such, this case will proceed as a bench trial.

### CONCLUSION

For the foregoing reasons, Defendant's Rule 56 Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part. Specifically, Defendant's Motion is **GRANTED** with respect to Clement's claim under § 1981, Hughes's claim under § 1981, and Hughes's retaliation

- 29 -

claim under § 1981.  Accordingly, the only claim that survives summary judgment is Clement's discrimination claim under 42 U.S.C. § 12182.  Clement is entitled to a bench trial on this issue.

The clerk is directed to send a copy of the Memorandum Opinion and accompanying Order to all counsel of record.

Entered this 28th day of February, 2013.

s/Jackson L. Kiser
SENIOR UNITED STATES DISTRICT JUDGE